THE STATE OF OHIO, APPELLEE, *v.* EIDING, APELLANT.[*]

[Cite as State v. Eiding (1978), 57 Ohio App. 2d 111.]

(No. 36426—Decided March 2, 1978.)

*Mr. John T. Corrigan,* prosecuting attorney, for appellee.

*Mr. Michael L. Smith,* for appellant.

KRENZLER, J. The defendant-appellant, Bradford Eiding, hereinafter referred to as the appellant, was indicted by the Grand Jury of Cuyahoga County on October 7, 1975, for one count of aggravated burglary[1] of the occupied

---

*Reporter's Note: A motion for leave to appeal was overruled by the Supreme Court of Ohio, May 11, 1978.

[1]R. C. 2911.11, Aggravated burglary, provides:

"(A) No person, by force, stealth, or deception, shall trespass in an occupied structure as defined in section 2909.01 of the Revised Code, or in a separately secured or separately occupied portion thereof, with pur-

112

home of Pamela Stephan and for one count of grand theft[2] of a gun owned by Pamela Stephan. The appellant entered a plea of not guilty to both counts of the indictment, waived a jury trial and was tried before a judge of the Court of Common Pleas on March 26, 1976. Prior to trial the appellant filed a timely notice of his defense of alibi in compliance with Crim. R. 12.1.

Pamela Stephan testified for the state that at 10:30 a. m. on September 4, 1975, she unlocked the door of her house at 3341 West 52nd Street in Cleveland, Ohio, entered the premises and was confronted by the appellant, a man she had known for about three years. She stated

pose to commit therein any theft offense as defined in section 2913.01 of the Revised Code, or any felony, when any of the following apply:

"(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

"(2) The offender has a deadly weapon or dangerous ordnance as defined in section 2923.11 of the Revised Code on or about his person or under his control;

"(3) The occupied structure involved is the permanent or temporary habitation of any person, in which at the time any person is present or likely to be present.

"(B) Whoever violates this section is guilty of aggravated burglary, a felony of the first degree."

[2]R. C. 2913.02, Theft, provides:

"(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either:

"(1) Without the consent of the owner or person authorized to give consent;

"(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

"(3) By deception;

"(4) By threat.

"(B) Whoever violates this section is guilty of theft. If the value of the property or services stolen is less than one hundred fifty dollars, violation of this section is petty theft, a misdemeanor of the first degree. If the value of the property or services stolen is one hundred fifty dollars or more, or if the property stolen is any of the property listed in section 2913.71 of the Revised Code, or if the offender has previously been convicted of a theft offense, then violation of this section is grand theft, a felony of the fourth degree."

The property listed in R. C. 2913.71 includes "a firearm or dangerous ordnance" as defined in R. C. 2923.11. R. C. 2913.71(C).

that the appellant grabbed her arm, that she jerked away screaming, and as she fled from the house she told him to leave. She testifed that the appellant left, taking with him a .25 caliber automatic pistol and an album of wedding pictures belonging to her that had cost $240. Ms. Stephan also testified that she checked the premises and found the woodwork border hanging from the wall around the door leading to the attic and the door latch lying on the floor; that the house was not in that condition when she left it the prior day; and that she had not at any time given the appellant permission to enter her house or damage her property nor had she ever given him a key.

After the appellant left her house, Ms. Stephan called the Cleveland Police Department and within fifteen minutes two policemen, Patrolman Joseph Sadie and Patrolman John Shembly, arrived and inspected the house.

Officer Sadie testified that during their investigation he observed that a door in the first floor bathroom which was locked from the inside had been entered; that it had been locked with a lock similar to a dead bolt lock; that "this lock was damaged by body force being used on the other side of the door, removing and ripping the casing away, and allowing the door to be opened"; that the door led up to the second floor attic; that at the top of the stairs there was a window overlooking a low roof of the house; that at the outside rear of the house they found a ladder placed against the house; that it appeared that someone had climbed up the ladder, put his foot on the gutter which was freshly damaged and went into an unlocked window; and that it appeared that someone had stepped in fresh paint and left an imprint on the roof.

At the close of the state's evidence, the appellant moved for a "directed verdict," which was overruled and the defense proceeded to present evidence through the appellant and two of his friends who testified that at the time of the offense the appellant was playing cards and shooting pool with friends.

During cross-examination the appellant was asked by the prosecutor why he had not told the police about his

alibi when he was arrested. The appellant replied that he was never interviewed by the police. In rebuttal the state presented Detective James Sibert who testified that after the appellant was arrested he was "read his rights" and refused to make a statement. The detective also stated that the appellant did not tell the police about his alibi. Defense counsel did not object to the admission of this evidence.

The trial judge found the appellant guilty on both counts of the indictment and sentenced him to the Chillicothe Correctional Institution for four to twenty-five years for the aggravated burglary conviction and for six months to five years for the grand theft conviction, with the sentences to run concurrently.

After the sentencing, defense counsel asked the trial court for an explanation of its reasoning behind the decision. The trial judge did not refuse to respond nor did he state that he found the appellant guilty beyond a reasonable doubt on the basis of the evidence presented on the elements of the crime. The trial judge in effect stated that he found the appellant guilty because he had not informed the police at the time of his arrest about his alibi. The judge commented as follows:

"The Court: The court is convinced that the testimony, as offered on behalf of the prosecuting witness, Miss Stephan, the police officers who testified that Mr. Eiding was given his rights. Mr. Eiding consistently denied ever having received his rights, which in the judgment of this court, completely impeaches his credibility.

"Two officers testified that they gave him his rights, Officer Walsh at the time of the arrest, Det. Sibert at the time of the interrogation.

"The court is persuaded that officers in this community traditionally, habitually give the rights to the defendants. He had an opportunity, it seems to me, to indicate the validity of his story upon his arrest.

"He says he was confined to the police station for four days. He had plenty of time, it seems to this court, to consult with counsel and offer this statement at that

time when he was interrogated on September 9, which was four days after he was arrested. He certainly had an opportunity at that time to give a full statement telling exactly where he had been.

"If the alibi had validity, it should have been expressed, in the judgment of the court, to the police officer at that particular time.

"Under these circumstances, the court chooses to believe the prosecuting witness rather than believe Mr. Eiding. Mr. Eiding's testimony also seems to be—to the court —incredible in view of the fact that apparently—according to his story—he was continuously engaged in a card game for a period lasting something like 12 consecutive hours followed by a period of shooting pool, lasting for another six hours, none of which is credible to the court. Even granting that these things can happen, it doesn't seem possible to the court that the people whom he was participating with, couldn't have played a card game that night. They didn't have enough money to play a card game that night.

"In any event, the court chooses not to believe the story of Mr. Eiding."

The appellant filed a timely notice of appeal and raises a single assignment of error:

"The trial court errored [sic] in not directing a verdict for the appellant when the evidence presented by the prosecution was insufficient to sustain a conviction as to all counts of the indictment.

The appellant asserts in this assignment of error that the trial judge erred in not granting a judgment of acquittal[3] at the close of the state's evidence. This assignment of error is not well taken. We have carefully reviewed the record and conclude that the state presented sufficient evidence to enable reasonable minds to find the appellant guilty of the offenses charged beyond a reasonable doubt.

We note, however, that the record reveals prejudicial

---

[3]Crim. R. 29.

error, which was not assigned by the appellant in his appeal to this court nor called to the trial court's attention. This error involves the submission into evidence of testimony regarding the appellant's failure to tell the police at the time of his arrest about his alibi and the use of this evidence by the trial judge in reaching a verdict of guilty.

Before we consider the substantive merits of this issue, however, we will address ourselves to the reason this court is considering an error in the record which was not raised in the trial court by timely objection nor was raised on appeal.

There are four possible combinations of circumstances that might occur with regard to the need to properly preserve and properly raise errors for appellate review. The first is where the error is timely brought to the attention of the trial court by objection and the trial court's ruling on the objection is specifically assigned as an error by the appellant in his appeal to this court. There is no question but that in such a case where the error is properly preserved in the court below and is timely raised on appeal, the court of appeals must consider and pass upon such errors. App. R. 12(A); R. C. 2505.21.[4]

---

[4]Appellate Rule 12(A) provides:

"In every appeal from a trial court of record to a court of appeals, not dismissed, the court of appeals shall review and affirm, modify, or reverse the judgment or final order of the trial court from which the appeal is taken. The appeal shall be determined on its merits on the assignments of error set forth in the briefs required by Rule 16, on the record on appeal as provided by Rule 9, and, unless waived, on the oral arguments of the parties, or their counsel, as provided by Rule 21. Errors not specifically pointed out in the record and separately argued by brief may be disregarded. All errors assigned and briefed shall be passed upon by the court in writing, stating the reasons for the court's decision."

R. C. 2505.21 provides in part:

"Appeals taken on questions of law shall be heard upon assignment of error filed in the cause or set out in the briefs of the appellant before hearing. Errors not argued by brief may be disregarded, but the court may consider and decide errors which are not assigned or specified. Failure to file such briefs and assignments of error within the time prescribed by the court rules is cause for dismissal of such appeal. All

The remaining situations involve the following three possible combinations of circumstances: (1) where the error is properly raised by objection in the trial court but is not specifically set forth as an assignment of error on appeal; (2) where the error is not raised by objection below but is set forth as an assignment of error on appeal; (3) and where the error is neither raised by objection below nor set forth as an assignment of error on appeal, which is the posture of this issue in the present case.

These three combinations of circumstances involve two fundamental issues for our resolution. The first is whether this court may consider an error in the record which the appellant failed to raise in the trial court, and the second is whether this court may consider an error in the record which the appellant fails to raise on appeal. We will address ourselves to the second issue first.

The court of appeals is specifically authorized by App. R. 12(A) to disregard any errors not specifically pointed out in the record and separately argued by brief. It is clear, however, that this court is not foreclosed from considering errors other than those assigned and specified, but may, in appropriate circumstances, consider errors of record not argued. The authority to exercise this discretion is found in App. R. 12(A), R. C. 2505.21 and court decisions. *Columbus* v. *Rogers* (1975), 41 Ohio St. 2d 161, 163; *State* v. *Juliano* (1970), 24 Ohio St. 2d 117, 120.

Appellate Rule 12(A) provides in part that "the appeal shall be determined on its merits on the assignments of error set forth in the briefs * * *, on the record on appeal as provided by Rule 9, * * *." We construe the language "on the record on appeal" as authorizing the court of appeals to

errors assigned shall be passed upon by the court, and in every case where a judgment or order is reversed and remanded for a new trial or hearing, in its mandate to the court below, the reviewing court shall state the errors found in the record upon which the judgment of reversal is founded.

"An appeal taken on questions of law and fact entitles the party to a hearing and determination of the facts de novo which shall be upon the same or amended pleadings."

consider errors which, although not specifically assigned by the appellant, are apparent upon the record.

Further we note that under pre-rule practice, R. C. 2505.21 specifically provided that reviewing courts "may consider and decide errors which are not assigned or specified." While much of the language of this section was incorporated into App. R. 12(A), the phrase quoted above was not so incorporated. We conclude, however, that since this part of the statute was never repealed it remains in effect and allows the court of appeals to consider errors in the record which it discovers but which have not been specifically raised by assignment of error.

We must next determine whether this court may consider an error which occurred during trial but which the appellant failed to call to the trial court's attention by objection or otherwise.

Prior to the adoption of the Rules of Criminal Procedure, Ohio had long followed the rule of law that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. *State* v. *Gordon* (1971), 28 Ohio St. 2d 45; *State* v. *Lancaster* (1971), 25 Ohio St. 2d 83; *State* v. *Childs* (1968), 14 Ohio St. 2d 56; *State* v. *Woodards* (1966), 6 Ohio St. 2d 14; *State* v. *Glaros* (1960), 170 Ohio St. 471.

Ohio adopted the Rules of Criminal Procedure which became effective July 1, 1973. Crim. R. 51 provides as follows:

"An exception, at any stage or step of the case or matter, is unnecessary to lay a foundation for review, whenever a matter has been called to the attention of the court by objection, motion, or otherwise, and the court has ruled thereon"

Criminal Rule 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

Several questions arise regarding the application of these rules to the issue in the instant case of whether this court may consider an error not raised in the trial court. The first concerns the relationship between Crim. R. 51 and Crim. R. 52(B), and the second is whether Crim. R. 52 applies to appellate courts.

While Crim. R. 51 implies that in order to preserve an error for review the matter must be called to the attention of the trial court in some manner, if we were to construe this rule as barring appellate courts from considering any errors not preserved below, the viability of Crim. R. 52(B) would be completely destroyed. We conclude, therefore, that these two rules must be read in *pari materia* and we reject any interpretation of Crim. R. 51 which would prohibit appellate courts from ever considering prejudicial errors which were not raised in the trial court.

To answer the question of whether Crim. R. 52(B) is the source of authority for appellate courts to review errors not raised in the trial court, we must look first to Crim. R. 1(C) which provides in part as follows:

"Exceptions. These rules, to the extent that specific procedure is provided by other rules of the supreme court or to the extent that they would by their nature be clearly inapplicable, shall not apply to procedure (1) upon appeal to review any judgment, order or ruling, * * *."

At first blush, it might appear that based on the language of Crim. R. 1(C) that Crim. R. 52(B) is inapplicable to appellate procedure. We note, however, that there are no other rules of the Supreme Court that specifically apply to this question regarding an appellate court's power to review errors not raised in the trial court. Further, we conclude that Crim. R. 52(B) is not, by its nature, clearly inapplicable to appellate procedure.

Lastly, our interpretation that Crim. R. 52(B) applies to appellate procedure is supported by the recent Ohio Supreme Court case of *State* v. *Wolery* (1976), 46 Ohio St. 2d 317. In this case, the court stated that Crim. R. 52 (B) alters the former practice whereby Ohio appellate courts would not consider errors not called to the trial

court's attention and clearly gives appellate courts the authority to consider such errors where the ends of justice so require. *State* v. *Wolery, supra,* at 326-327.[5]

We conclude, therefore, that under the authority of Crim. R. 52(B) Ohio appellate courts have the discretion to notice errors or defects affecting substantial rights although they were not brought to the attention of the trial court. This interpretation of our authority is not in conflict with the recent decision of the Ohio Supreme Court, *State* v. *Williams* (1977), 51 Ohio St. 2d 112, wherein it was held in paragraph one of the syllabus that:

"An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. (Paragraph one of the syllabus of *State* v. *Glaros,* 170 Ohio St. 471, approved and followed.)"

We construe this holding as giving the appellate court the discretion to refuse to consider errors not raised in the trial court but as not barring an appellate court from considering such errors. *See State* v. *Gideons* (1977), 52 Ohio App. 2d 70.

Further, we note that the cases of *State* v. *Williams, supra,* and *State* v. *Humphries* (1977), 51 Ohio St. 2d 95, decided the same day, involved errors in the instructions

---

[5]In this case the Ohio Supreme Court refused to consider an assignment of error upon appeal pursuant to Crim. R. 52(B) where the defendant had adequate legal representation at trial, and where it was apparent from the record that the failure to object was a deliberate tactic of counsel. In discussing the application of Crim. R. 52(B), however, the Court clearly held that under the authority of this rule appellate courts may consider errors, although not raised at trial. The Court stated that the purpose of Crim. R. 52(B) is "to safeguard the right of a defendant to a fair trial, notwithstanding his failure to object in timely fashion to error at that trial." *State* v. *Wolery* (1976), 46 Ohio St. 2d 317, 327-328.

For additional recent court decisions construing Crim. R. 52(B) as allowing appellate courts to consider errors not raised in the trial court see *State* v. *Hill* (1977), 52 Ohio App. 2d 393; *State* v. *Fischer* (1977), 52 Ohio App. 2d 53; *State* v. *Craft* (1977), 52 Ohio App. 2d 177.

to the jury and the application of Crim. R. 30 which provides that no party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict. The error in the instant case does not involve instructions to the jury but pertains to the improper admission and use of evidence of the appellant's silence at the time of his arrest.

It is a very easy matter for a reviewing court to refuse to consider an error because a defendant failed to preserve it by objection or otherwise at the time of trial. When an error is clearly apparent on the record and is prejudicial to the appellant, there is no justifiable reason to ignore such an error where the interests of justice require that review be granted. This does not mean that notice of plain error under Crim. R. 52(B) should be taken in every case. But, while the rule should be sparingly applied it should be used when necessary to prevent a manifest miscarriage of justice. *State* v. *Long* (1978), 53 Ohio St. 2d 91.

The final question to be determined then is whether the error in this case affects substantial rights and, therefore, constitutes plain error under Crim. R. 52(B). A recent Ohio appellate court has defined "plain error" under Crim. R. 52(B) as follows:

"* * * obvious error prejudicial to a defendant, neither objected to nor affirmatively waived by him, which involves a matter of great public interest having substantial adverse impact on the integrity of and the public's confidence in judicial proceedings. The error must be obvious on the records, palpable, and fundamental, and in addition it must occur in exceptional circumstances where the appellate court acts in the public interest because the error affects "the fairness, integrity or public reputation of judicial proceedings." *United States* v. *Atkinson* (1936), 297 U. S. 157, at 160. [footnotes omitted]." *State* v. *Craft* (1977), 52 Ohio App. 2d 1, 7.

In the instant case, the admission of the evidence with regard to the appellant's silence following his arrest and the use of this evidence by the trial court in reach-

ing its verdict of guilty involve fundamental constitutional rights under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 10, of the Ohio Constitution. The violation or denial of these rights affects whether a criminal defendant is afforded due process and receives a fair trial. To hold that a defendant waived his right to assign as error the admission and use of such evidence because his attorney failed to object, when, at the time of the trial, the admission of such evidence had not yet been declared unconstitutional would, in our opinion, subvert the interests of justice and the integrity of our judicial system.

We conclude that substantial rights of the appellant were affected by the trial court's use of the evidence of the appellant's post-arrest silence and that such use constituted error so plain and fundamental that we shall consider it although it was not raised below and was not specifically assigned as an error on appeal. *See United States* v. *Nolan* (1969), 416 F. 2d 588, 594, *certiorari denied*, 396 U. S. 912.

Several recent decisions of the United States Supreme Court and the Ohio Supreme Court are pertinent to our resolution of the issue under consideration.

The privilege against self-incrimination embraced by the Fifth Amendment of the United States Constitution and made applicable to the states in criminal prosecutions by way of the Due Process Clause of the Fourteenth Amendment has been held to guarantee to individuals the right to remain silent during a period of custodial interrogation as well as in the courts. *Miranda* v. *Arizona* (1966), 384 U. S. 436, 460-467. As a means of safeguarding Fifth Amendment rights the *Miranda* decision held that a person taken into custody must be advised immediately that he has the right to remain silent, that anything he says may be used against him and that he has a right to retained or appointed counsel before submitting to interrogation. *Miranda* v. *Arizona, supra,* at 467-473. Absent these warnings, any statements made by the accused may not be used as evidence against him in a subsequent trial.

Prior to the *Miranda* decision the United States Supreme Court held in *Griffin* v. *California* (1965), 380 U. S. 609, 615, that "the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the states by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." The Court reversed the defendant's conviction for first-degree murder on the ground that the prosecutor had commented upon the defendant's failure to take the witness stand and testify in his own behalf and that such comment breached the defendant's Fifth Amendment right to remain silent.

Subsequently, the Ohio Supreme Court held in *State* v. *Stephens* (1970), 24 Ohio St. 2d 76, paragraph 3 of the syllabus, that "[w]here during an in-custody interrogation, a defendant chooses to remain silent, it is prejudicial error for the prosecutor, during his final argument to the jury, to comment upon that silence or any implications which may be drawn therefrom." The court concluded that the defendant's Fifth Amendment right to remain silent had been violated by the prosecutor's reference to the defendant's silence at the time of arrest for the apparent purpose of implying defendant's guilty knowledge that a prescription for cocaine was forged. The court rejected the argument that by taking the stand to testify in his own behalf the defendant had waived the protections against self-incrimination. *Id.*, at 81.

It has been held, however, that post-arrest *statements* made by an accused that are inadmissible because the accused has not been advised of his rights under the *Miranda* decision, may be used for the purpose of impeaching the defendant's credibility when he later testifies at trial in his own behalf. *Harris* v. *New York* (1971), 401 U. S. 222.

In *Doyle* v. *Ohio* (1976) 426 U. S. 610, 611, the United States Supreme Court addressed the question of "whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told

the story after receiving *Miranda* warnings at the time of his arrest'' (footnote omitted). The Court expressly held that the use for impeachment purposes of a defendant's silence at the time of arrest and after receiving *Miranda* warnings, violates the Due Process Clause of the Fourteenth Amendment.

The prosecutor had argued in *Doyle* that under the authority of *Harris* v. *New York, supra,* the defendant's silence following arrest was admissible for impeachment purposes. The Court held that the *Miranda* decision required rejection of the prosecutor's position despite the importance of cross-examination. The danger seen by the Court in the use of such evidence lies in the ambiguity that is inherent in every post-arrest silence. While there is some probative indication in an arrested person's post-arrest silence that his exculpatory story, told for the first time at trial, is untruthful, the Court concluded that because of the *Miranda* warnings that the state must give to each arrestee "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights." *Doyle* v. *Ohio, supra* at 617. Because such post-arrest silence is "insolubly ambiguous" the Court concluded that to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial would be fundamentally unfair and a deprivation of due process. *Id.,* at 617-618.

We find support for our decision in the instant case in both *State* v. *Stephens, supra,* and *Doyle* v. *Ohio, supra.*[6]

---

[6] The instant case is distinguishable from the recent decision of the Ohio Supreme Court in *State* v. *Osborn* (1977), 50 Ohio St. 2d 211. In the instant case, as in *Doyle* v. *Ohio* (1976), 426 U. S. 610, the defendant remained silent after receiving the *Miranda* warnings subsequent to arrest. In *Osborn,* however, the defendant had not been silent, but had freely and extensively talked to law enforcement officers prior to and after being taken into custody. In such a case where an accused in effect waives his constitutional right to remain silent by talking freely with police officers regarding events surrounding the offense, his failure to mention other exculpatory events or details, such as an alibi, that he later relates at trial may be used by the prosecutor to impeach the defendant's credibility.

The present case is factually identical to the *Doyle* case, with the exception of two noncontrolling distinctions. The first is that the exculpatory story in *Doyle* related to a purported "frame-up" while the exculpatory story of the appellant involves an alleged alibi. This disinction is irrelevant to the applicability of the *Doyle* decision to the case before us.

The second distinction is that in *Doyle*, the case was tried to a jury while the present case was tried to the court. In *Doyle* the Supreme Court found reversible error because of the danger that the jury might have disbelieved the explanation of the defendant because of his post-arrest silence where in fact the defendant had been merely asserting his right to remain silent at the time of arrest. The record before us reveals that the exact danger which the *Doyle* decision warns against actually occurred and resulted in the appellant's conviction.

As noted earlier, evidence was admitted in the form of rebuttal testimony from a police officer and in cross-examination of the appellant that following his arrest the appellant did not tell the police about his alibi. After finding the appellant guilty, the trial judge stated that his reason for the guilty verdict stemmed from his disbelief of the appellant's alibi because the appellant failed to tell the police about the alibi at the time of arrest and remained silent. Yet the record indicates that in remaining silent the appellant was exercising his constitutional right to remain silent. The transcript of testimony reveals that following his arrest the appellant was advised of his constitutional rights in accordance with *Miranda* and thereupon refused to make a statement until he could consult with an attorney. There is an implicit assurance in the *Miranda* warnings that silence in the wake of them will carry no penalty. *Doyle* v. *Ohio, supra,* at 618. Therefore, when the trial judge penalized the appellant by disbelieving his alibi and finding him guilty on the basis of the appellant's post-arrest silence, the appellant was denied due process of law in violation of the Fourteenth Amendment.

We conclude, therefore, that the admission into evi-

dence of the appellant's post-arrest silence and the trial judge's use of this silence as a basis for finding him guilty constituted reversible error.

*Judgment reversed.*

PARRINO, P. J., concurs.

PRYATEL, J., dissents.

PRYATEL, J., dissenting. I respectfully disagree with my esteemed colleagues.

What effect an error has upon a jury is difficult, if not impossible, to determine. But in this case, the judge sat in fact as well as law, and in response to a request from counsel, the judge explained the reasons for his finding of guilt.

In the opinion of the majority, that finding was based on one consideration, and it states:

"After finding the appellant guilty, the trial judge stated that his reason for the guilty verdict stemmed from his disbelief of the appellant's alibi because the appellant failed to tell the police about the alibi at the time of arrest and remained silent."

In reading the court's remarks, I am unable to reach that same conclusion. Before the judge began his discussion of alibi, he said, as quoted in the majority opinion:

"The court is convinced that the testimony, as offered on behalf of the prosecuting witness, Miss Stephan, the police officers who testified that Mr. Eiding was given his rights. Mr. Eiding consistently denied ever having received his rights, which in the judgment of this court, *completely impeaches his credibility.*" (Emphasis added.)

Thus, irrespective of the alibi the judge found the defendant unworthy of belief.

The judge then commented on the alibi to the effect that if it had validity, it should have been given to the police officer on September 9th—four days after the defendant was arrested—which I concede was erroneous.

Thereafter, the judge held that the alibi (in effect, no matter when given) was inherently unbelievable when he concluded by saying, as quoted in the majority opinion:

"* * * Mr. Eiding's testimony also seems to be—to the court—incredible in view of the fact that apparently— according to his story—he was continuously engaged in a card game for a period lasting something like 12 consecutive hours followed by a period of shooting pool, lasting for another six hours, none of which is credible to the court. Even granting that these things can happen, it doesn't seem possible to the court that the people whom he was participating with, couldn't have played a card game that night. They didn't have enough money to play a card game that night.

"In any event, the court chooses not to believe the story of Mr. Eiding."

One must remember that the court came to its conclusion by evaluating the witnesses as it listened to the questions and answers on both direct and cross-examination and as it observed their demeanor.

Under these circumstances, and considering the comment of the judge in its entirety, I cannot agree with the majority that, but for the trial court's error, the outcome of the trial *clearly* would have been otherwise, in keeping with the ruling of the Supreme Court of Ohio in *State* v. *Long* (1978), 53 Ohio St. 2d 91, 97. Keeping in mind, furthermore, that notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice, *State* v. *Long, supra,* at 97, the error in the present case, taken in context, is not plain error.

I would affirm.